SAM E. HUGHES, JR.,

                **Plaintiff,**                 **CIVIL ACTION NO. 07-11920**

    **vs.**                       **DISTRICT JUDGE PAUL V. GADOLA**

                                **MAGISTRATE JUDGE MONA K. MAJZOUB**

COMMISSIONER OF
SOCIAL SECURITY,

                **Defendant.**

_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:** This Court recommends that Plaintiff's Motion for Summary Judgment (Docket no. 13) be **DENIED**, and that of Defendant (Docket no. 18) **GRANTED** and the complaint be **DISMISSED**.

*\*\*\**

Plaintiff filed an application for Disability Insurance Benefits and Supplemental Security Income on September 5, 2002 alleging that he had been disabled since April 18, 2002 as a result of weakness in the left arm and shoulder, shoulder pain and neck pain. (TR 23, 51, 52, 67, 354). The Social Security Administration denied benefits. (TR 32-37). A requested *de novo* hearing was held on June 14, 2004 before Administrative Law Judge (ALJ) Douglas N. Jones. (TR 23, 389). The ALJ subsequently found that the claimant was not entitled to Supplemental Security Income or Disability Benefits because he had not been under a disability at any time up until the date of the ALJ's decision. (TR 29). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 7). The parties filed Motions for Summary Judgment. The issue Plaintiff raises for review is whether the ALJ's decision is supported by substantial evidence.

Plaintiff was 37 years old at the time of the administrative hearing. (TR 394). Plaintiff has a ninth grade education. (TR 73, 394). Plaintiff testified that he cannot read well and he had assistance filling out his paperwork. (TR 407). He testified that he can count money, add and subtract but cannot multiply numbers. (TR 416-17). Plaintiff was employed as a roofer, a tree trimmer and a laborer. (TR 68, 76, 395, 404-05). As a roofer Plaintiff carried 100 pound rolls of rubber and 75 pound buckets of primer up ladders. (TR 68, 77, 406). Plaintiff testified that he last worked in April 2002. (TR 410-11).

Plaintiff lives with his wife and son. (TR 394). In October 2002 Plaintiff reported that he engaged in household chores of dusting and child care twice a week for about ten minutes. (TR 90). For hobbies, Plaintiff talks to his friends on the phone and watches his son race his dirt bike. (TR 92-96, 98). Plaintiff used to ride a motorcycle himself, but cannot anymore. (TR 91, 98).

Plaintiff testified that he has problems with his left shoulder, back and neck and has hip pain. (TR 396-98, 400). Plaintiff testified that his shoulder pain started when he woke up one morning and his shoulder felt "like someone put a knife right through it" and he went to the emergency room. (TR 409). Plaintiff had surgery on his shoulder in February 2003. (TR 411). Plaintiff is 5'9" tall. (TR 412). Plaintiff testified that at the time of his roofing work, he weighed approximately 185-190 pounds and was strong, but after the surgery he weighed 141 pounds, and at the time of the hearing he weighed 150 pounds. (TR 411).

Plaintiff is prescribed MS Contin for pain relief and testified that he takes one 60 mg tablet every eight hours, which was increased from a 30 mg tablet. (TR 401, 407). Plaintiff testified that the MS Contin decreases his pain and he is still able to converse when he takes it. (TR 407). He also testified that he suffers constipation secondary to his medication and was hospitalized for the

same for three days in spring 2004. (TR 412). Plaintiff takes a product called "Go Lightly" and two laxatives every morning for constipation. (TR 413). Plaintiff testified that he is often constipated for over twenty days and when he contacts the doctor's office, the doctor gives him more "Go Lightly". (TR 413). Plaintiff smokes one pack of cigarettes a day. (TR 401). He has a history of substance abuse and alcohol use and testified that the last time he had alcohol was in May of the year prior to the hearing. (TR 106, 402). Throughout the hearing Plaintiff testified that he was "not very good" with times and dates and the transcript shows that he did not have knowledge of or was confused about what year his father died, what year he had his injury, and when he held various jobs in relation to the present and the year of the hearing. (TR 399, 394-95, 401-02). Plaintiff's wife handles his scheduling for him and she dispenses his medications so he does not forget to take them. (TR 422-23).

Plaintiff has a driver's license and drives three to four times a week. (TR 398). Plaintiff testified that if he drives too far and stresses himself he gets a migraine headache and has to lie flat or sit bent over to relieve it. (TR 399). Plaintiff's wife drives him to another city once a month to attend a pain clinic. (TR 398). At the time of the hearing Plaintiff had been attending the pain clinic for approximately six or seven months. (TR 413-14). In spring 2004 Plaintiff went to see a neurosurgeon for his back pain, Dr. Malcolm Fields. (TR 414). Plaintiff testified that he did not go back to see his former doctor, Dr. Roth, because Dr. Roth recommended putting a "tube" or rod in his back for the pain, yet could not "guarantee" that Plaintiff's pain would go away. (TR 415).

Plaintiff testifies that he cannot lie flat and he sleeps in a reclining chair. (TR 420-21). He cannot sleep through the night and he takes up to two naps a day. (TR 421). Plaintiff reported that as of September 30, 2002 he needed assistance with showering, had not been able to drive for three

to five months and could not bend over.  (TR 103).

## *Vocational Expert*

A vocational expert (VE) testified at the hearing.  (TR 423).  The ALJ asked the VE to assume a hypothetical 37 year old individual with a ninth grade education, viewed as a marginal education due to professed difficulties in reading and writing, and able to perform sedentary work with the following additional limitations:

> [A]n option to alternate between sitting and standing at will; involves occasional bending at the waist; occasional bending at the knees; occasional kneeling; no crawling; occasional climbing of stairs; no climbing of ladders; no exposure to unprotected heights or [intrinsically] hazardous uncovered moving machinery; and only occasional overhead reaching with either arm; and no prolonged or constant rotation, flexion, or hypertension of the neck; and no constant repetitive wrist movements; and no detailed instructions; and no extended periods of concentrated (sic) and by extended periods, I mean no more than five minutes would be required to mentally understand and actively process a given task, but there could be multiple tasks to do during the day; only occasional interaction with members of the public or with supervisors; and no need to prepare or interrupt (sic) written material as part of the job.  (TR 424-45).

The VE testified that such an individual would not be able to perform Plaintiff's past jobs due to the lifting requirements alone.  (TR 425).  The VE further testified that Plaintiff's past jobs were unskilled.  (TR 425).  The VE testified that jobs available in the sedentary unskilled category would include approximately 2200 visual inspector jobs and 5000 assembler jobs in the lower peninsula of Michigan.  (TR 425).  The VE clarified that such jobs do not require constant wrist movements and there would be no bending.  (TR 427).  The VE testified that one day or eight hours of unexpected absences per week would eliminate these jobs.  (TR 426).  The VE further testified in response to Plaintiff's attorney's questioning that a requirement to nap for one hour per day would also eliminate these two jobs.  (TR 428).

## *Medical Evidence*

On January 30, 2002 Plaintiff complained that he had left shoulder pain and weakness since the previous May. (TR 219, 255). An x-ray of Plaintiff's left shoulder revealed a "normal shoulder." (TR 219). On May 7, 2002 Jorge T. Gonzales, M.D. examined Plaintiff's complaints of left upper extremity pain and weakness, difficulty abducting the arm and persistent pain in the left scapular area. (TR 123). An EMG on May 7, 2002 revealed moderate to severe neuropathy of the left suprascapular nerve, evidence of acute denervation and chronic changes. (TR 123).

An MRI on June 18, 2002 revealed a central disk herniation at the C4-5 level effacing the thecal sac and spinal cord slightly, central spinal stenosis secondary to degenerative changes at the C5-6 level with degenerative changes effacing the existing nerve roots, and a small disk herniation at C6-7 effacing the left paramedian portion of the thecal sac. (TR 130-31).

Plaintiff went to the hospital on July 8, 2002 complaining of "pulling something" in his mid-back. (TR 132). Plaintiff was examined by Jon S. Mettert, D.O. who noted that Plaintiff had some tenderness in the mid-to-low T-spine region, no radiation of pain and full forward flexion. (TR 133). X-rays revealed degenerative changes of the lower dorsal spine with slight wedge deformities of multiple lower thoracic vertebral bodies "unchanged from previous." (TR 134). No acute abnormality was seen. (TR 132-35).

Plaintiff was examined by Dennis F. Dettloff, M.D. on July 15, 2002 for preoperative clearance for surgery on July 30, 2002. (TR 136). Dr. Dettloff noted that Plaintiff had tenderness in the thoracic and cervical spine with palpation of range of motion. (TR 136). On July 19, 2002 Bruce F.C. Gomberg, M.D. noted that Plaintiff's shoulder pain was changing and Dr. Gomberg was concerned that the surgery may not help him, therefore he referred Plaintiff for a diskogram to determine the etiology of the pain. (TR 142). Plaintiff underwent the cervical diskogram on July

31, 2002. (TR 138). During the exam, Plaintiff reported that his pain at rest was a 6-7 on a scale of 10. (TR 138). July 31, 2002 x-rays revealed disc degeneration at C5-6 with endplate hypertrophy and mild disc space narrowing. (TR 137). On August 8, 2002 Dr. Gomberg noted that Plaintiff's problems were more involved than originally suspected. (TR 140). He noted that Plaintiff may require a three level corpectomy with associated diskectomies and referred him to Dr. Herb Roth for further treatment. (TR 140).

A September 25, 2002 myelogram revealed posterior and particularly left uncovertebral spur formation at the C5-6 level, severe narrowing of the left C5-6 neural foramen, borderline narrowing of the spinal canal at C5-6, a small disk herniation at the C4-5 level and a small spur formation at C6-7. (TR 148-49). Dr. Roth discussed the option of surgery involving the anterior C5-6 and 6-7 with possible inclusion of C4-5 diskectomy/hemicorpectomy fusion. (TR 151). On November 27, 2002 Plaintiff underwent an examination for presurgical clearance for a surgery on his cervical spine scheduled for December 16, 2002. (TR 216). Notes of December 16, 2002 state that Plaintiff reported that Dr. Roth "[d]isabled him." (TR 253).

On February 3, 2003 Dr. Roth performed surgery on Plaintiff's cervical spine including an anterior C5-6, C6-7 diskectomy, anterior C5-6, C6-7 fusion with C6 hemicorporectomy and fibular allograft and anterior C5 through C7 plating. (TR 197). On March 20, 2003 Dr. Roth noted that Plaintiff was one month post status anterior C5-C7 decompression fusion and was doing well with some occasional neck discomfort. (TR 199). Plaintiff's upper extremity sensory and motor exam was intact, his incision was healing well, x-rays demonstrated good positioning of the bone graft and plate anteriorly, and the post anterior C5-6, 6-7 disketomy fusion was doing well. (TR 199). Dr. Roth refilled Plaintiff's Vicodin prescription. (TR 199). On March 21, 2003 Plaintiff reported to

the emergency room with complaints of back pain, left hip pain and difficulty breathing following a ten-hour car ride the previous day. (TR 205-06). He was prescribed Tylenol and Motrin and diagnosed with thoracic strain. (TR 206-08). X-rays revealed degenerative changes of the lower dorsal spine with mild wedge deformity of T8 through T12 vertebral bodies, findings suggesting previous Scheuermann's disease and no acute abnormality. (TR 210).

On April 17, 2003 Dr. Roth noted that Plaintiff continued to do well and had no complaints. (TR 200). The doctor noted that Plaintiff may begin driving short distances. (TR 200). On June 25, 2003 Dr. Roth noted that Plaintiff complained of discomfort over the neck and a "cracking" sensation when Plaintiff turns his head, some mid back pain on the right side greater than the left, and low back pain "with his legs 'bothering him at night.'" (TR 202). The doctor noted the Plaintiff had "some neck discomfort with range of motion however appears to have been quite active over the last month also." (TR 202). Dr. Roth advised Plaintiff to discontinue use of the hard collar and begin some cervical isometric exercises. (TR 202). Dr. Roth also prescribed Neurontin to relax Plaintiff's legs. (TR 202).

An MRI in August 2003 revealed bulging annulus at the T8-T9 and T9-T10 levels and a broad-based small herniated nucleus pulposus at T9-T10 level that "can not be excluded." (TR 203). In August 2003 Dr. Roth noted that Plaintiff's neck was "doing well" and Plaintiff was still complaining of mid thoracic pain. (TR 317). In September 2003 Dr. Roth reported that he did not recommend any surgery for Plaintiff's bulging disks at T8-9 and T9-10 levels. (TR 315). On February 3, 2004 Dr. Roth noted that Plaintiff's thoracic MRI revealed some slight disk bulges but no significant herniation. (TR 204).

Plaintiff sought treatment from January 2004 through April 2004 for abdominal pain and

constipation, likely secondary to chronic back pain and narcotic use. (TR 300-314, 304, 318-322, 339). In February 2004 Plaintiff was using Fentanyl patch and taking Vicodin for pain. (TR 314).

X-rays of the cervical spine in January 2004 revealed postsurgical changes related to the anterior cervical fusion from the C5 through C7 level, mild degenerative changes encroaching on the neural foramen on the right at C4/5 and C5/6 secondary to degenerative spurring, left sided neural foraminal narrowing at C3/4, C4/5 and C5/6 and the surgical plate appeared to be well aligned. (TR 323-24). On March 13, 2004 Dr. E. Malcolm Field, M.D. noted that Plaintiff had significant restriction of cervical spine motion with palpable crepitation and upon review of his old MRI it appeared that he was developing multiple level disc disease. (TR 266). On April 24, 2004 Dr. Field examined Plaintiff's complaints of mid thoracic pain and tenderness. (TR 264). Dr. Field noted no new or additional findings after a systemic review and Plaintiff's gait was normal. (TR 264). The doctor noted no signs of atrophy, fasciculations, or autonomic change. (TR 264). On May 6, 2004 Plaintiff under went a CT and a myelogram of the thoracic spine, ordered by Dr. Field. (TR 260). Bradley T. Van Assche, M.D. concluded that there was a finding at the T9/10 disc level that was related to disc protrusion or herniation and it was slightly displacing the spinal cord in a posterolateral direction. (TR 260). The myelogram showed a slight extradural defect at the T8/9 level with anterior wedge deformities. (TR 262).

Plaintiff began attending the Munson Pain Clinic in 2003 for his neck, upper back, hip and leg pain. (TR 268-69, 299). The record contains notes from November 2003 through October 2004. (TR 268-98, 369-88). On November 14, 2003 Richard G. Burke, M.D. noted that the radiating component of Plaintiff's pain was intermittent. (TR 292). Plaintiff reported that his pain increased when lifting something, like his grandchild, and his neck pain increased with movement of his neck.

(TR 292). His neck pain radiates into his left shoulder but does not radiate into his arms or head. (TR 292). Plaintiff reported that although he had some weakness in his left shoulder around the time of the neck surgery, he felt that the strength in his left shoulder and arm had improved to "near normal." (TR 292). He had trouble raising his arms over his head because of the pain. (TR 292). Dr. Burke offered Plaintiff lower thoracic epidural injections but Plaintiff was "afraid of such procedures." (TR 293). Dr. Burke prescribed low-dose methadone. (TR 294). On May 27, 2004 Dr. Burke reported that Plaintiff had no new complaints but complained of widespread pain. (TR 274). Plaintiff reported sexual dysfunction and skipping a dose of morphine prior to sexual encounter had not helped. (TR 274).

A psychological assessment was completed by Vincent Cornellier, PhD at Munson in November 2003. (TR 288). Dr. Cornellier noted that Plaintiff reported that his pain is a 3 or 4 on a scale of 10. (TR 288). Plaintiff reported depression when he was younger, however, at the time of the examination was "not talking about depression other than episodically." (TR 288). Plaintiff reported that he is dyslexic and "basically illiterate." (TR 288). Plaintiff reported that he enjoys hunting with his son and the doctor reported that Plaintiff "became quite animated talking about the possibility of doing this tomorrow, which is opening day." (TR 288). Plaintiff reported that he still hoped to go back to work. (TR 289). Dr. Cornellier concluded that Plaintiff had "some depression" but it was stable at the time and reactive to his loss of activity and loss of society. (TR 289). He suggested that Plaintiff should be followed up closer to home, such as at Community Mental Health. (TR 289).

Barbara Halazon, M.A., LLP and Margaret K. Cappone, PhD performed a consultative psychiatric and psychological exam on Plaintiff on February 14, 2003. (TR 164-74). Plaintiff's test

results showed a Verbal IQ of 81, a Performance IQ of 75 and a Full Scale IQ of 76, his Verbal Comprehension Index was 76 and Perceptual Organization Index was 80. (TR 172). He had strength in his ability to attend and recall digits and the examiners noted that this "would indicate that simple attention is strong for him." (TR 172). Plaintiff was examined within weeks of his surgery and the examiners noted twice that he was in obvious pain. (TR 169, 173). The examiners placed him within borderline intellect and noted that based upon Plaintiff's description and test results "it is likely that he suffers from multiple learning disabilities, specifically in the areas of reading and mathematics." (TR 173). Bruce G. Douglass, PhD performed a Mental Residual Functional Capacity Assessment in March 2003 and noted that Plaintiff "retains the capacity to perform simple tasks on a sustained basis." (TR 181).

**ADMINISTRATIVE LAW JUDGE'S DETERMINATION:**

The ALJ found that although Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 18, 2002 and suffered from degenerative disc disease of the cervical and thoracic spines status post laminectomy, discectomy and fusion at the C5-7 levels (February 2003), episodes of constipation and abdominal pain, borderline intellectual functioning, anxiety disorder, NOS (Not Otherwise Specified) with obsessive compulsive traits, an adjustment disorder with mixed disturbance of emotions and conduct, a personality disorder, NOS and a history of polysubstance abuse, collectively severe impairments, he did not have an impairment or combination of impairments that met or equaled the Listing of Impairments. (TR 26). The ALJ found Plaintiff's allegations regarding his limitations were not entirely credible and he retained the residual functional capacity to perform a limited range of sedentary exertional level work. (TR 29). Based on Plaintiff's exertional capacity for sedentary work and his age, education and work experience, and

the testimony of the Vocational Expert, the ALJ found that there are a significant number of jobs in the economy that Plaintiff can perform. (TR 29). Therefore, he was not suffering from a disability under the Social Security Act. (TR 29).

**STANDARD OF REVIEW:**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the

decisionmakers can go either way, without interference by the courts").

## DISCUSSION AND ANALYSIS:

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff was required to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f) and 416.920(a)-(f).  If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his residual functional capacity ("RFC"), age, education and past work experience to determine if he could perform other work.  If he could not, he would be deemed disabled.  *See* 20 C.F.R. §§ 404.1520(g) and 416.920(g).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualification to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

Plaintiff argues that the ALJ's finding that Plaintiff's complaints were not fully credible is not supported by substantial evidence and failed to take into account significant objective medical findings in the record and, therefore, the RFC is not supported by substantial evidence.  (Docket 13).  Plaintiff next argues that the ALJ's finding that no period of twelve consecutive months had elapsed during which Plaintiff lacked the functional capacity to perform sedentary work was not supported

by substantial evidence. (Docket no. 13). Finally, in his Reply brief Plaintiff requested a sentence six remand on the basis of Dr. Field's August 28, 2004 report. (Docket no. 21, TR 366).

### *Plaintiff's Credibility*

Plaintiff argues that the ALJ did not properly assess his complaints of pain and the extent of his symptoms and failed to take into account objective medical findings. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *See id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

Furthermore, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). In addition to objective medical evidence, the ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain

relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

The ALJ found that Plaintiff's "allegations that he can perform no sustained work activity because of right arm dysfunction, pain and numbness in his right leg, numbness in both hands, and inability to read more than very simple material, difficulty remembering things, and the need to take a 45-minute nap every afternoon are not fully credible." (TR 27). Although the ALJ found that Plaintiff's "documented impairments undoubtedly generate symptoms of the general type described," the ALJ also found that Plaintiff's assertions regarding the intensity, persistence and functionally limiting effects of the symptoms were not substantiated by the record. (TR 27). The ALJ properly considered Plaintiff's engagement in daily activities, including minor household chores, watching his children and attending motor cross races and found that these activities were "consistent with the exertional demands of sedentary work." (TR 27).

The ALJ also considered Plaintiff's treatments and medications and found that the record contained a lack of aggressive treatment that has "not been required or proposed since the February 2003 neck operation," that the cervical fusion was considered stable, and that Plaintiff had declined epidural injections recommended by Dr. Burke. (TR 27, 200, 293, 317). On August 19, 2003 Dr. Roth reported that Plaintiff's "neck has been doing well" as was the C5-C7 fusion. (TR 317). The ALJ also pointed out that Plaintiff is treated with medications generating no documented side-effects. (TR 27). The ALJ noted that the objective clinical findings and medical tests "show no significant loss of range of motion or loss of neurological function since February 2003, although Plaintiff still walks with an antalgic gait." (TR 27, 215, 265, 274).

Plaintiff argues that the ALJ misstated certain medical findings and Plaintiff's daily activities. (Docket no. 13). Plaintiff also argues that the ALJ "placed improper and unreasonable weight upon certain DDS examiners' reports." (Docket no. 13 at 5). Specifically, Plaintiff alleges that state agency reports dated January 14 and February 25, 2003 are inaccurate and the ALJ relied on them in its credibility determination. (TR 27, 106-09). The ALJ must consider the findings of fact made by state agency medical consultants regarding the nature and severity of a claimant's impairments as expert opinion evidence of a non-examining source according to Social Security Ruling ("SSR") 96-6p. *See also* 20 C.F.R. §§ 404.1527(f), 416.927(f). The ALJ properly considered the state agency consultant's reports. The daily activities which the ALJ cited in his credibility determination, including minor household chores, driving, watching his children and attending motor cross races, all appear in the reports and are otherwise supported by the record as set forth above. (TR 27, 90, 92-96, 106, 108). The reports also state that Plaintiff "rides motorcycles," but information in Plaintiff's transcript indicates that he no longer does so. (TR 19, 106, 108). However, the ALJ did not rely on this reported activity in his credibility determination. (TR 27).

Plaintiff alleges that the February 25, 2003 report is also inaccurate and is "simply a DDS examiner's summary apparently based upon that person's review of the records." (Docket no. 13 at 8). Plaintiff alleges that the report is inaccurate because the examiner listed Plaintiff's pain medications under "Medications and Treatment Interventions" and not under the immediately following topic, "Measures to Relieve Symptoms." (TR 106). Plaintiff's argument is not persuasive and its reading of the report in this manner is tortured at best. The Court does not find that this is an inconsistency either within the Report or between the Report and the remainder of Plaintiff's

record.  Plaintiff also argues that the ALJ erred in referencing or relying on some exhibits which were completed prior to Plaintiff's surgery.  The ALJ properly considers all evidence in the case record when making a determination or decision about whether the claimant is disabled.  20 C.F.R. § 404.1520(a)(3).

Plaintiff also alleges that the ALJ ignored Plaintiff's "one year of monthly visits at the Munson Pain Clinic."  (Docket no. 13 at 11).  The ALJ is required to consider the applicant's medical situation as a whole.  *See Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004).  Although the ALJ is not required to discuss every piece of evidence in the record, an ALJ should discuss evidence that, if believed, could lead to a finding of disability.  In reviewing the ALJ's decision, the Court must scrutinize the record in its entirety.  *See Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992).    The ALJ considered and cited to the Munson records at Ex. F at least three times in his decision.  (TR 25).  The ALJ noted that Plaintiff was evaluated at the pain clinic in November 2003 and later cited to the pain clinic physician, Dr. Burke's notes that Plaintiff complained of widespread pain.  (TR 25).   *See Hoelck v. Comm'r of Social Sec.*, 2008 WL 64705 (5th Cir. Jan. 7, 2008) (citing extensively to that medical visit suggested that the ALJ considered it.).


The ALJ cited the record including Plaintiff's complaints of pain to his physicians.  The ALJ further made clear which of Plaintiff's statements he found less than credible and provided the evidence he considered in making that finding.  The ALJ's credibility determination is supported by substantial evidence[1].

---

[1]Plaintiff also argues that the ALJ's reference to his "appearance and demeanor" at the hearing, without further explanation, is insufficient to establish Plaintiff's lack of credibility. The Court finds that the ALJ has cited substantial evidence upon which to base its credibility

***Whether the ALJ's RFC Finding Is Supported By Substantial Evidence***

Plaintiff argues that the ALJ's RFC is based upon the ALJ's credibility findings as to pain and is therefore not supported by substantial evidence. Plaintiff also argues that the RFC ignores an alleged diagnosis of Dr. Roth concerning a five month period of disability and Dr. Burke's diagnosis of "disability."

As set forth above, the ALJ determined that Plaintiff has the RFC to perform a limited range of sedentary work. Due to the Plaintiff's non-exertional limitations, the ALJ properly referenced the regulations, Pt. 404, Subpt. P, App. 2, Rule 201.24, 20 C.F.R. §§ 404.1569 and 416.969 as a framework which would direct a conclusion of "not disabled" and further relied on the VE's testimony to determine what effect Plaintiff's non-exertional limitations would have on the number of jobs available in the economy. In a hypothetical question posed to the vocational expert ("VE"), an ALJ is required to incorporate only those limitations which he finds credible and supported by the record and the ALJ did so. *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Finally, as set forth in detail below, the ALJ did not err in failing to find disability despite Dr. Burke's diagnosis of "disability" and the form from Dr. Roth's office with the notations "Disabled" and "5 months." The RFC is supported by substantial evidence.

***Whether the ALJ's Finding that There Was No Period of Twelve Consecutive Months During Which Plaintiff Lacked the Functional Capacity to Perform Sedentary Work Was Supported By Substantial Evidence***

Plaintiff next argues that the ALJ's finding that no period of twelve consecutive months had elapsed during which Plaintiff lacked the functional capacity to perform sedentary work was not supported by substantial evidence. (Docket no. 13). The initial burden of proof to establish a

---

determination without reaching the issue of Plaintiff's demeanor and appearance at the hearing.

disability rests upon the claimant.  *See Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995); *Her*, 203 F.3d at 391.  An individual is disabled within the meaning of the Social Security Act when he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1509, 416.909.

Plaintiff argues that following his surgery, Dr. Roth "disabled" him for five months.  (TR 155).  The evidence on which Plaintiff relies for this assertion is a form on which the date is unclear.  The transcript's List of Exhibits shows that the form is from the time period April 17, 2002 through October 11, 2002.  The form is not signed by Dr. Roth although his letter head and name appear at the top.  Further, the portion of the form which indicates that Plaintiff is "disabled" is entitled "Patient Disability Statement."  (TR 155).  A box is checked for "disabled" and near the checkbox is handwritten "5 months."  (TR 155).  It is not at all clear that the disability statement was completed by a doctor, and in fact is signed by Plaintiff under a statement that authorizing "my insurance benefits to be paid . . ."  (TR 155).

The ultimate finding of disability is reserved to the Commissioner.  Although it is proper for the ALJ to give a treating physician's opinion controlling weight, the Social Security Administration Regulations do not afford the same deference to opinions on an issue reserved to the Commissioner, such as a final determination of "disabled" or "unable to work."  Dispositive administrative findings relating to the determination of a disability are within the purview of the Commissioner.  *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).  The ALJ did not err in failing to find that this document establishes Plaintiff's disability for a period of five months.  Similarly, Dr. Burke's sole notation of "Disability" under "Diagnoses" without further explanation on reports dated November 14, 2003

and May 27, 2004 does not establish Plaintiff's disability. The ALJ's decision that Plaintiff was not disabled was based on substantial evidence.

### *Whether Plaintiff is Entitled To A Sentence Six Remand On The Basis Of Dr. Field's August 28, 2004 Report*

Plaintiff in its Reply Brief asks the Court for a "sentence 6" remand to consider Dr. Field's August 28, 2004 report as new and material evidence. This report is dated after the hearing yet prior to the ALJ's decision. "The court is confined to review evidence that was available to the Secretary, and to determine whether the decision of the Secretary is supported by substantial evidence." *Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Where a party presents new evidence on appeal, this court can remand for further consideration of the evidence only where the party seeking remand shows that the new evidence is material." *Id.* (*citing Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 553-54 (6th Cir. 1984)). "Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial." *Id.* (*citing Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988)).

The court may still remand the case to the ALJ to consider this additional evidence but only upon a showing that the evidence is new and material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). This is referred to as a "sentence six remand" under 42 U.S.C. § 405(g). *Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 549 (6th Cir. 2002).

The party seeking remand has the burden of showing that it is warranted. *Sizemore v.*

*Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). "A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357 (*citing Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984) (per curiam)). "In order for the claimant to satisfy his burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d 709, 711 (6th Cir. 1988) (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)).

Plaintiff submitted a report by Dr. Field, dated August 28, 2004 which was created prior to the ALJ's decision. The evidence was therefore not new and Plaintiff has not shown "good cause" for failing to provide these documents earlier. *See Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986). Plaintiff argues that the pain, muscle weakness and tenderness in the report "confirm the results of the CT, MRI and myelogram performed prior to the hearing." (TR 366). However, the report makes no mention or reference to a CT, MRI or myelogram. It further states that the doctor is "going to start the investigation with an EMG study" of Plaintiff's shoulder and "go from there." (TR 366). In addition to citing Plaintiff's neck, shoulder and arm pain, the report also notes that Plaintiff's "extremity strength seems to be intact" and his "gait is normal." (TR 366). The report is not "material" in that it does not discuss symptomology, clinical findings, or limitations greater than those imposed by the ALJ. Based upon the information before the Court, a remand for consideration of the evidence presented by Plaintiff would not be warranted.

**RECOMMENDATION:**

In sum, the ALJ's decision was within the range of discretion allowed by law and there is simply insufficient evidence for the undersigned to find otherwise. Accordingly, Plaintiff's Motion for Summary Judgment should be DENIED, that of Defendant GRANTED and the instant Complaint dismissed.

**REVIEW OF REPORT AND RECOMMENDATION:**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: July  3 , 2008                              s/Mona K. Majzoub
                                                   MONA K. MAJZOUB
                                                   UNITED STATES MAGISTRATE JUDGE

**<u>PROOF OF SERVICE</u>**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: July  3, 2008                               s/D. Opalewski for Lisa Bartlett
                                                   Courtroom Deputy